We'll hear argument this morning in Case 12-9012, Robers v. United States. Mr. Green. Mr. Chief Justice, and may it please the Court, with respect to property crimes, Section 3663A of the Mandatory Victims Restitution Act requires an offset against a restitution order when any part of the property is returned to the victim. This case concerns secured loans for the purchase of real estate. Pursuant to those loans, the lenders took a property interest in the subject real estate, namely the right to foreclose and take title in the event of default. When the lenders foreclosed and took title, that represented a fully realized return of their preexisting property right. Section 3663A further requires that that property be valued as of the date of its return and not at some later date when the lender sells to a third party. When you said fully, fully returned, it wouldn't be fully returned if the debt was  The property would be fully returned, and the property right that is the right to foreclose is returned upon the default, Your Honor. Let me just make it clear. If the loan is for $300,000, fraudulent loan, fraudulently obtained loan, and the property is foreclosed upon and is worth at the time $200,000, is it your position that the property has been fully returned and that there is no liability for the difference? No. No, Justice Kennedy. That's not our position. Our position is only that the property has to be valued at the time that the foreclosure or sheriff's auction takes place. And one more question. Under Wisconsin law, when there is a foreclosure, is there some automatic valuation ordered by the court, or is there an appraiser that automatically is appointed, or do we just decide value based on the bids at the ultimate sheriff's sale? There is not any required appraisal, Your Honor. But frequently our understanding is that lenders who credit bid for those properties will, in fact, conduct an appraisal because they want to know how much they should  So I have two related questions. The first is, what your client got was money. And I don't know why it's impossible, impractical, or inadequate to measure the loss by the amount he got and order him or her to pay it. He can pay it on a payment schedule, on any — in any way that the court wants him to pay it. So I don't know why we're in B-1 or B-2 at all, because I don't see where the impracticality comes in. Answer that. But then secondly, it's not clear to me that we're thinking about this right. There seems to be no dispute that a loss to the victim is the amount that the victim is spending to sell the property and recoup the money. And you don't seem to be taking issue with that. And 366 — 366-3-2 appears to be the return of the property at sentencing or sometime thereafter. That's right. So it doesn't seem to be controlling earlier return of property. And yet we're sort of stuck in that model that somehow it has to be an either-or, the earlier date of return or on the date of sentencing. But shouldn't be — and this follows up on Justice Kennedy's question — shouldn't it be at the time the investor can reasonably secure something from the return of that property, the date of sale? If we're letting them recoup the expenses of sale, why don't we just simply recognize the value on that date? And if an investor who takes property inadequately decides to hold on to it or with no reasonableness holds on to it or gives it away to their mother or sells it to somebody for a nominal fee, then it should be the date at which they got rid of it or the day or the value on the date of return or something like that or the date that they should have done something with the property. Why are we stuck on these? Isn't the whole idea is to make the victim whole? Don't you make the victim whole on the day a reasonable investor would have gotten rid of the property? The whole idea is to make the victim whole. And as reflected in my answer to Justice Kennedy's question, that restitution order would be for the difference between the amount of the loan and the value of the property as of the date the property was returned. Your Honor, first asked about impracticability. And, in fact, it is impracticable for Mr. Roebers to return the loan proceeds. He can't do that. Those loans were wired to an account for the benefit of the sellers. So we submit what you say. But money is fungible. Money is fungible, but so are property and money fungible, and in exactly the way that my friend on the other side of the podium suggests here. That's because ultimately the property gets sold and the proceeds come back, according to their theory. Their theory is one of strict identity with respect to the application of B. But as Your Honor points out, B doesn't really apply here, because all we're talking  This is a situation that's not fungible. You know, if I were arguing your side of the case, I would not say that the bank got defrauded of money. Your client never got the money. The money had to be spent in order to buy the property. What the fraud here consisted of is that the bank got a loan, a mortgage, an interest in property. Assured by a less-than-solvent debtor when it expected to get an interest in property, assured by a solvent debtor. And why isn't the nature of the fraud precisely the mortgage? This is not as good a mortgage as the bank anticipated it was getting. And therefore, you don't have to — it is indeed the very same property. They gave them back the real estate, but it was not as much as they had expected. That's correct, Justice Scalia. When I said we're only talking about money, I was attributing that to the argument of the solicitor general. Our argument is exactly the one that you've articulated. The property, the race here, the thing that was given back was the property interest that the lenders originally took. What would happen if it turned out that the property was worth more on the date of sentencing than it was on the date of foreclosure? Then two things might happen. One is the lender at foreclosure, Your Honor, takes full title, and they can do with the property what they will. If it turns out that the property is worth more at the date of sentencing, then that's because of the risks and maybe the conservatism of the particular lender, and that is their benefit. That's our position. Our position is not a one-way ratchet, Your Honor. However, if it turns out to be worth a whole lot more on the date of sentencing, then defense counsel might be able to come in and say to the Court, look, the foreclosure amount was X. Shortly thereafter, the property got sold for twice X. That indicates, Your Honor, that the value as of the date of foreclosure might actually have been higher, and Your Honor should use, instead of the credit bid amount that the debtor paid for the property, a higher amount. I don't want to agree. Ginsburg How do you arrive at the foreclosure amount? I mean, the one virtue or a virtue of the government's approach is you get the money. You know exactly how much the house sold for. How do you, at the time of foreclosure, there's been no sale, how do you determine the value? You said, Wisconsin, that there are often appraisals, but there wasn't any in this case, was there? Not that we know of, but we don't know exactly what the lender did. However, I would point to Joint Appendix, page 77. In there, one of the victims, which was the Mortgage Guarantee Insurance Corporation, testified, Mr. Farmer testified at the sentencing, that they use a computer model. They decided that they would pay the claim that was made by the lender and take title to the property because their model told them that the expenses of the property and the value of the property would ultimately be worth more than the particular amount that they would pay in the claim. So that's a situation where, quite in this case, where the victim has gone ahead and valued the property using their computer model and accepted the property with an intent. Breyer. Could you answer this question? Go ahead. Could you answer, it just happens, not this case, an ordinary case. Defendant goes to Mrs. Smith. Mrs. Smith, I have a bridge I'd like to sell you. Wonderful. Let's go to the account, your account, take out $100,000 and give it to me. She does. Now, it turns out he didn't own the bridge. So he owes her $100,000. Judge, pay her $100,000. Your Honor, I don't have the money with me. In fact, I don't have it at all. But I also gave her my valuable Babe Ruth bat. And I don't have to give her $100,000. After all, she has the bat. Okay? Now, what happens? I mean, variations on that theme come up every day of the week, I imagine. What happens? In that instance, your Honor, under our theory. Not under your theory. You practice in this area. I want to know what normally happens. This is a variation, I imagine, of a very common theme. If she accepted the bat. Yes, she did. The bat is on her mantel. If she accepted the bat, then the value of the bat is set off against the $100,000. Perfect. And it comes under A, not B. Wouldn't you say? It comes under A. Because, after all, if he doesn't have the $100,000, does he? So if you're going to say that means the fact that he doesn't have it, that he can't return it, and we're under B, what B says to do is pay $100,000. So you'd end up not being able to read B. It would be incoherent, I think. So it must come under A, not B. I mean, I would have thought so. They'll read it while I make these criticisms, and then they'll show me on the government side. I haven't read it correctly. All right. But in any case, whatever it comes under, we subtract the value of the bat. So why don't we do here just what they do there? But what B tells us to do is when to value the bat. And that's why B actually applies. And is that how the courts have run this? I mean, you know, it strikes me as so common that they are supposed to return some money, and in fact, they will return the money, but it has to be less the value of something that's already been given to those individuals. Again, when are we going to value it? I guess it would be up to the judge. The judge is not there for something, and the judge would in fact normally, if she sold the bat, take the value at the time she sold it. And there is 90 days he can ask her to sell it. Your Honor, I don't want to sell it. I don't want to sell it. It's a Babe Ruth bat. Very well, Madam, I will value it for you. We'll call in an assessor. That's at least one way I would expect it to work, and I don't understand why it doesn't work that very same way here. Well, it may work that very same way, in that B tells us value it at the greater of the date of loss or at the date of sentencing. So B. Sotomayor, that's my whole point. That may not make the seller whole. What makes the seller whole is on the day that he or she sold the item and received money. That's the government's point. But, well, that's not the government's point, because the government wants to value it as of the date of the sentencing. But whatever the seller received on the day he or she sold the bat, that's the value that the seller has put on that item. But what if she doesn't sell the bat? And then that's the question. And then we're in the exact conundrum here that the government creates. Well, not really. Not in this case, because in this case the property was sold, it was sold late. But it was not, it was not, it was sold before the sentencing. One of the properties was sold quite late, Your Honor. Yes. 33 months after the foreclosure took place. Well, that was my question earlier, which was reasonable for that seller to hold on to the property that long. We would say potentially not, Your Honor. The point is we don't know. And the point is Mr. Robers can't foresee it. But before we go there to causation issues, I wanted to address Justice Breyer's point about the bat, because the government's theory of the interpretation of 3663A doesn't allow for that. Their theory is it has to be strict identity. Money is money is money. That's what they keep repeating. They do not allow for a situation in which a defendant prior to sentencing offers up some good or property. No, he doesn't. You say their government, look, in the case of an offense resulting in the loss of property, my poor victim lost $100,000, so that's this case. Return the property, i.e., return the $100,000. Okay? That's simple. That's A. So judge says defendant, return the $100,000. Now, let's try to take B. If return of the $100,000 is impossible, say because he's broke, then what are you going to do? Then pay the greater of the value of the property, which is $100,000, on the date of loss, or pay the $100,000 on the date of sentencing. Now, wait, I'm sorry, that makes no sense. If you can't pay the $100,000, then what you have to do is pay the $100,000 or pay the $100,000. I'm sorry. That's why I say that reading it that way, to me, doesn't make much sense. And therefore, I think this is a case of A. It is a case where you simply ordered, return the $100,000. And there is implicit in that you don't have to return more than she already took, and you already gave her the bat. I mean, the bat counts as some kind of a return. We have to value the bat. It doesn't tell us what to do. It's up to the judge. Well, the bat doesn't count as a return on the government's theory because it's not a return of the same property. Oh, yeah, yeah, yeah. You have to give her $100,000. It doesn't say anything about what form it has to take. And our problem is some of it takes the form. It isn't cash. And then, as Justice Sotomayor points out, section 3664 contemplates what the judge can order turned over at sentencing. So our theory allows for a valuation of the bat, whether the value of the bat is greater at the time it's turned over or at the time the loss occurred or the time of sentencing, the judge gets to decide that under B. And who has the burden of proof? If you – we know the proceeds when it's sold. It's not sold, but you say it has to be valued as of the time of foreclosure. And I think you said someplace in your brief that it's the government's burden to show the value at the time of foreclosure. That's correct, Your Honor. Actually, the statute says that at 3664e, Your Honor. Well, the government's interest, I think, would be to show a low value, right? That's correct. It would be the defendant's burden of production. But do you say the sentencing judge has to call appraisers? I mean, valuation of property is the standard stuff of civil proceedings in condemnation and many other cases. You call – each side calls appraisers. The appraisers give their judgment, then the jury, the judge decide. You want that to happen in every restitution case like this? Not in every restitution case, Your Honor. But as you say, courts are well-equipped to do it. We're not arguing that it's not. Well, I'm not sure a sentencing court is well-equipped to do it. A sentencing court has to call appraisers? Yes, Your Honor, if they're going to challenge what the foreclosure amount would be. Mr. Green, here's one way of looking at this case. Maybe you'll tell me this is the wrong way of looking at it. But let's assume that the bank sells the property within a reasonable period of time or as quickly as one could reasonably expect. So one way of looking at this is which party bears the risk that there is going to be a significant deterioration in the real estate market between the time of foreclosure and the time of sale? Now, your answer to that is that the victim should bear that risk? Why should that be? Why would Congress want that? Because the victim had complete control and dominion over the property once the victim foreclosed on the property. But real estate isn't completely liquid, and so it takes some time to sell it. So between the time when the foreclosure occurs and the time when the victim is able to sell the property and get money, there is a deterioration in the real estate market. Why should the victim bear that risk? Because the victim has complete dominion and control, Your Honor. And we wouldn't say, for example, even under the government's theory, if it were a baseball card collection and somebody had returned part of the baseball card collection, we wouldn't say that the defendant is responsible for what the owner of the baseball card collection does with it after it gets returned by the victim. Alitoso, it's a completely formalistic answer. Suppose that the what the person who perpetrated the fraud returns is a truckload of tomatoes, very valuable, it's worth exactly the value of the original loan, but very perishable. And by the time the tomatoes can be sold, they're all rotten. So they're worth nothing. And you would say, well, they had dominion and control over the truckload of tomatoes. What is the difference? Well, if they accepted the truckload of tomatoes and they decided not to do anything with them, just like if the lender takes the property back and lets it go into the collection. That wasn't the hypothetical. You're really confusing me. Both the baseball bat and the truckload of tomatoes do not come under B. I thought that was your case. Under B, you can deduct the value as of the date the property is returned of any part of the property that is returned. That's correct. The baseball bat is not a return of part of the property that was stolen, nor is the cartload of rotten tomatoes. So what are we talking about here? That's precisely the point I'm trying to make. It's not a return because it's not the same. It's not a part of the property. Why didn't you say that? You were quibbling about when it should be valued. You should have said it doesn't come under B at all. Well, in part because the question about who bears the risk is a legitimate question. But because there is not. Not if it doesn't come in the statute at all. Well, frequently the issue is why should a fraud feeser actually get the benefit of a decline in the real estate market? And the answer is because it's not the fraud feeser doesn't proximately cause what third parties do with a part of the property that the fraud feeser returns once the fraud feeser has returned that property. Do you agree that if the real property is returned and that everybody agrees that on the day the property is returned, the value is less than the loan amount, that the victim is entitled to the difference between that value and the loan amount? Yes. Then we are under B and then we are talking about money and not the mortgage property. Well, we're still talking about property because as I said at the outset. Money is property. We're still talking about the value of the loan valued in terms of money and not of the real property, right? Otherwise, your concession that the victim is entitled to the difference can't work. Well, it would work, Your Honor, because we do have to put a monetary value on the property as of the date of foreclosure. The victim is entitled to the difference in the value of the property and the amount of money stolen based, in your view, on the value of the property at the time that it's returned, correct? That's correct. Then we are under B, correct? That's correct. We believe we are. Yes. Yes. You made a point about under Wisconsin law, there would be in the foreclosure, suppose there were a foreclosure, there could be no deficiency judgment. Were you trying to suggest from that that you get the property and no restitution for the rest? No, Your Honor. We weren't trying to suggest that we would. And we're not standing on the deficiency judgment. What we are suggesting is that in determining what the appropriate restitution is, in determining the value of the property that was returned at the time the lenders took default, we're looking at the difference between the foreclosure date and the value of the loans as they were lent. So we're not standing on any deficiency judgment. What if I don't think that the mortgage has anything to do with returning property, that a mortgage, the real estate is not cash, okay? What if I think it doesn't come under B at all? How would it be treated if it doesn't come under B? It would be treated still in a similar fashion. And even if the government's theory were to prevail here, we think we still win because a credit bid at foreclosure for a piece of property is treated as cash. That's a cash transaction, Your Honor. It's considered to be a cash transaction. And that means cash has been paid for cash. The lender has, and that stands to reason. Cash hasn't been returned. I mean, you could say the same thing about the baseball bat. He gives him a baseball bat. It's had nothing to do with the cash that he got. And you would say, well, when he sells the baseball bat, he gets cash. Therefore, cash has been returned. That's surely not right, is it? But this Court said in Radlax that a credit bid is the same as cash. And that's what lenders do when they foreclose on real estate. They credit bid, and that's the same thing. It's the same with the baseball bat, right? No, I don't think it is, because that is a different transaction. Legally, that credit bid is treated as cash. I'd like to reserve the remainder of my time for rebuttal. Roberts. Roberts. Thank you, counsel. Ms. Harrington. Thank you, Mr. Chief Justice, and may it please the Court. I'd like to start with what I think at least is some common ground between the government and Mr. Robers. And that is that if a defendant fraudulently deprives a victim of a car and then or an elephant, he's not entitled to an offset because what the victim lost was a car and the car is not the same as pineapples or an elephant. We think that's exactly what happened here. What the victims lost in this case was money. What they got back was houses, which is not the same. Now, Petitioner says it is the same. What happens if they decide to give the house to the banker, to his mother or grandmother? Well, then that would bring in principles of proximate cause under the MVRA. So if I can just say, in the vassal. No, it doesn't bring into principles. You have to give them. They took a property that had a value at some point, perhaps during the entire period. What date does the judge use to determine the value of that house? Well, in that case, Justice Sotomayor, no part of the property that was lost by the lenders would have been returned to the lenders. And so instead there would be some other property that was returned, which is the houses, and then they would have made an independent choice, which is not the choice that the vast, vast majority of banks make, to do something other to do something with the house other than to sell it. And so in that case, the district court would have to use its discretion to value what had come back to the lenders, and probably the best way to do it would be to value it at the time that they disposed it. But that's not true. So you're, yes, the judge would use his or her discretion and decide what would have been a reasonable value of that house at a time when the lender should have sold it, not when they received it, not when the sentencing happened, not after the sentencing, but on the day the court decides whether a reasonable investor who's taken back the property should have converted it to cash. But I think it's very important to note that that situation would not fall under 3663a)(b)(1)(b)(2). Yes, it's under 3664, which is quite a different thing. Right. That's a different thing because no part of the property that was lost in that situation was returned to the victim. That's my point exactly. Right. But what we're talking about here is a situation in which some part of the property that was lost was returned to the victim. And the question is, well, what was the property that was returned to the victim? We say it was part of the money that they lost. Mr. Rober says it was the house. But the victims didn't ever own the houses. They never intended to own the houses. They had no interest in having the houses. And so when they got the houses back, no part of the property was returned to them. No part of the property was returned until they didn't. So, Ms. Harrington, your whole argument really rests on that statutory language. And one of the questions that came up in the last half hour is, is that the right section of the statute? Now, in your view, which is that the only thing involved here is money, that's the law that's involved here. Why aren't we under A rather than B? Because Mr. Rober doesn't have the money that he took from the victims, and so it's Right. But usually when you don't have money, I mean, let's just say I'm a fraud victim and I get an order of restitution for $100,000 and the fraudster doesn't have the $100,000. He only has $50,000. So the Court says, well, now you have to pay the $50,000 and we're going to put you on a schedule of payments and you're going to pay the other $50,000 over the next year or two years, whatever. Would you think that that's under B? So our view is that 3663a governs the calculation of the loss to the victims. And 3664 governs how the defendant pays back a restitution award. And so in your hypothetical, what would happen is that the Court would order the defendant to return the part of the property he took that he still has, the $50,000, and then under 3664a he would put him on a payment schedule to pay back the restitution. So you think that my hypothetical, let me just, I'm sorry, is under B, not under A? I do think it's under B, yes. So any time I don't have enough money to make the victim whole, it's under B, not A? Yes. And you would get an offset for the amount of the money that you returned to the lender. Well, I don't, I guess, gosh, I don't know, but I would have just thought that it was under A for pretty much the same reason that Justice Breyer said. It just doesn't make sense for it to be under B. I mean, essentially, you're saying, you know, if return of the cash is impossible, pay the cash under B. That just doesn't, that's not a sensible statutory command. Well, it does make sense if you remember that 3663a is about calculation of the loss at the time of sentencing. And so it's not about, you know, how much of the loss you're going to have once the restitution order has been paid off, because at that point the victim will have no loss. They will have been paid. What you're trying to calculate is what was the loss that we're going to order the restitution for. And so if the victim, excuse me, if the defendant still has part of the property that he took, then the court says give it back, and then we calculate the net loss that the victim has, $100,000. Any difference? I mean, you know, it's odd to read B as applying, because it says if you can't pay back $100,000, now we're in B, and what B tells you to do is pay $100,000. I mean, that's what it says. And then you have to subtract the amount you already gave, which, of course, you'd have to do anyway. Because it's — But B says return the property. Return the $100,000. If the property is a bat, you return the bat. If you don't have the bat, you can't return the bat. If the property is $100,000 — No, no. Forget they're bats. It's just $100,000. No, no, no. But if — She brought this in. I brought in a certain — You brought it up. — quality to this discussion, which may not have contributed as much as I hoped. But the point is, imagine it's all money. I mean, if it's all money, A applies, that should be the end of it. If you want to apply B, do. But it's a wash. What I'm saying is that the property that was lost is the property that was lost. If the property that was lost was a crate of tomatoes and you don't have it and you can't give it back, something else has to happen. No, but you see, it does make a difference as to whether A or B applies, because your whole argument is premised on the language of B. So if we're not in B, if we're in A, your statutory argument goes away, and then we just try to figure out what offset rules make sense. I mean, there's got to be an offset in A, too, right? Suppose we were under A. It's got to be. You don't think that there's an offset under A? I don't see an offset under A. A just says return the property. If you have the property, you return the property. If I could just give the second half of what I was going to say just as prior. But suppose — suppose another case. Just say the second half. What I'm saying is, if you have the bat, you give the bat back. If you took $100,000 and you don't have $100,000, you can't return the property. It doesn't matter that once under 3664 the district court structures the way you pay a restitution order, that ultimately you will be paying $100 a month for 182 years, which is what this guy is going to be doing, which is to say that money is never going to get back to the lenders. Kagan. What do you think happens in an A case where — let's — in a mortgage case, so there's a home, but this — this person also has cash and repays the full amount in cash. And now the bank has the full amount in cash, but also has this home. And then the bank sells the home. Is — is the defendant entitled to an offset? The defendant is entitled — sorry. If the — if the defendant pays back the full amount of the cash that it took and the lenders have taken title to the house, then the lenders have no loss because the full amount of the property has been returned to the defendant. Under our view — and let me just say, this situation really never arises. Kagan. But if it did arise, because I'm trying to figure out, it seems to me that there has to be an implicit offset in A as well. So, no, I think the way that would — I think it would come under 3664. And under 3664, district courts have discretion to fashion a restitution order that fits the circumstances of the case. Alito, Mr. Harrington, is it correct, this argument that it's all under A? It has been said that that — that getting to B is based on this idea. A says if you can't return the property, if you can't return the money, B says return the money. But is that accurate? What A says is if you don't — if it's impossible to return the money, assuming that's the thing at issue, B says return the value. And under 3664, it is possible for the court to order not a — not restitution of money, but restitution of in-kind services. So there can be — value can be conveyed in a form other than money. So it isn't circular, is it, in the way that's been suggested? No, I don't think it is. And A actually does not govern situations in which return of the property is not possible. That's all under B. And we really think that that is this case. It didn't have to be— Breyer, if you want to read it that way, it's the same problem. It seemed redundant, not circular, but you don't think it's redundant. Okay. Fine. The same problem is there. You go to 3664, and what happened was it says in 3664, enter a restitution order, Judge. And when you do that, provide for a lump sum payment or partial payments or specified intervals, in-kind payments, a combination of payments, it gives the judge a lot of discretion. So I imagine the judge, if he had already given her back 20,000, would say now, defendant, pay her 80,000 more. Yes. Now, the problem here is instead of giving her the 20,000, he gave her an in-kind payment. You see, he gave her a baseball bat or, in this case, a house. Right. So now our question is how do we value the house, and the statute doesn't tell us. Since that's so, I would have thought, you have a very good point, if, as here, the victim has sold the house already, well, what he got for it. That's the end of that, unless, of course, it was an unreasonable, fraudulent or hooked-up sale, which the defendant can point out and the judge could. But what happens if she won't sell the house? She says, I love the bat, I love the house, I'm not selling. Then you say you have 90 days to do it. Right. Or let it befall on you when it helpfully falls, and then what you have to do is value the house if she still won't sell it. Yes. And you have to value the bat if she still won't sell it. Do I have that right? Yes. But you would value the bat or the house as a replacement of property under Section 3664-F-4, not as a return of the property that was lost. It was not a return. Right. Because it's not the property that was lost. It's in-kind property they're trying to get. Right. But under Section 3664, you're allowed to make an in-kind payment with return of property or replacement of property. Return of property is return of the property that was lost. Replacement is giving some other kind of property different from what was lost. But under Section 333- Sotomayor goes back to how do you measure and when do you measure this? It's easy if the property is returned on the date of sentencing or 90 days after or not returned then. Because then the judge could basically figure out what's a reasonable time, the date of sentence, or within the 90 days, the day they sold the property. It's easy when they sell the house because they've gotten back the money, which is part of the property that was lost. But the question becomes what happens when the house is done before sent, given over, not as a part of sentencing, but independently? So then I think that's why I don't think any of these provisions, really answer that question. And so why don't we go back to the basics? Why should the victim so that I think you agree with this. Why should the victim suffer the loss attendant to selling property that decreases in value because during the time that they were teeing it up for sale, the market dropped? And you say the victim shouldn't. The victim should not.  Sotomayor But let's assume that the market dropped and they sold it. What's the value you give to the victim? It's the date that the victim sold the property, no? Right. But that's because that's when they got back part of the property they lost. Because the property they lost was money. When they got the house, no part of the property that they lost was returned to them until they got the money back. Now, Justice Breyer asks you what happens if on some day they did something unreasonable? They just kept the property, they gave it to a grandmother, they sold it to someone for a nominal amount, a sham transaction. What does a judge do then? They kept the property because they just didn't want to sell it. They just let it die because they were lazy. Is that a case the victim should be made whole for their loss? No, because that's a case. I mean, yes, in the sense that they should be made whole for the part of the loss that's attributable to the actions of the defendant. But that's a situation where part of the victim's net losses would be attributable to independent decisions that are commercially unreasonable, made by the victim. And so that's where proximate cause came in. That's not this case. In this case, there's no indication that the lenders held on to the houses for longer than was reasonable. Kennedy, do you agree that the victim, in this case the bank, may not hold on to the property for an unreasonable period of time? Yes. So in this case, one of the houses took 33 months to sell, as the Petitioner's counsel pointed out. But that was a house where, at the sheriff's sale, there were a total of zero bidders on the house. And so nobody wanted to buy the house. And so if you were going to value the house at the point of foreclosure, maybe you would value it at zero, which wouldn't really be good for anybody. It certainly wouldn't be good for the defendant. There wasn't anything at all in the record to suggest that there was an undue, that that 30 months was an undue delay. There certainly was not. There's a question about this case that I would like you to answer before you finish. This is a case of a young man, 19 years old. He gets hooked into this scheme. He gets $500 for each parcel, $1,000, and then he's ordered to make restitution of $219,000. He was a bid player in this scheme. What happened to the people who dreamed up this scheme, Little and Valadez? They were ordered to pay a much larger amount of restitution because they were involved in the fraudulent acquisition of many, many more houses than these two houses. So had they been ordered to pay restitution for these two houses? They were. And the district court held Mr. Robers and his co-conspirators jointly and severally liable for the losses from these two houses. Now, the section 3664H allows a district court to apportion losses if it wants to. It was Mr. Robers asked the court to do that. The court decided not to do that. He hasn't appealed that part of the decision to this court, and so that's sort of dropped out of the case. But that is an option under the MVR. Breyer, I think I understand now better than I did what his argument is. I see now why you want to go from A, because there are all kinds of property. They could be taken, not just money. And they say, now, A is out of it because he wasn't able to return it. So we're in B. And I was saying, well, B requires the same thing. And you say, that's right. So what's the point? Well, you say, but that's how it works for other property anyway. Now, when we get to B, we get that last phrase. They want to make, like, doubly sure that if, in fact, some of the property had already been gone back, it's going to count. And he's saying, well, it did go back. It was in-kind, the baseball bat or the house. And he's saying, now, how do we value that? And you say, well, let's value it the same way as we would value in-kind property were there a list, is that right, of 3664. And you then go on to say, the simplest thing to do is if they should sell it. And then I say, okay, maybe they should, but they don't want to. And then what do we do? And the answer is call in experts like he wants. Now, have I got that right? You've gotten that right. And I just want to add the element that the reason you do that is when the house goes back to the victim, no part of the property they lost has been returned to them. And I think it's important to recognize that in almost all of these mortgage fraud cases, the bank forecloses on the property long before sentencing. Well, I'm not sure you'd say no part of the property they lost has been returned. What's been happening is they've got some in-kind return. They've gotten different property. But under section 3663, it uses the phrase the property after it has declared that the property is the property that was lost. And so when you get a house back and you've lost money, no part of the property you've lost has been returned. And again, if I can just say, in these mortgage fraud cases, the banks have foreclosed and sold the houses generally long before sentencing, in this case, even before the defendant was charged with any crime. And banks, so banks aren't thinking about restitution when they're taking title to the houses and selling them. What they're thinking is, we want to turn these houses into money because that's what we lost and we want to maximize our return on the houses. And they're not thinking of restitution as some sort of insurance against their needing to be responsible in selling the houses, because as in this case, most defendants don't have the resources to pay a restitution fee. And when they sell and they get much more money than they ever was thought from the house, that extra amount also counts then in the defendant's favor? Absolutely. Under our view, the defendant gets the benefit of that and the victim would not be overcompensated. Under his view, he wouldn't get any benefit of that and the victim would get double recovery. Well, how does the defendant get the benefit of that? What would the defendant do to go get the excess? Well, again, usually the house has sold long before sentencing, and so if the value of the property has gone up between the time of foreclosure and the time of the subsequent sale, then the offset amount is, again, the amount that the bank gets when they sell the house. And so that's an amount larger than the value of the house at the foreclosure and the defendant gets a larger offset. You would agree that the total amount lost. If it's over the total amount lost, then the victim's loss is zero as a result of the defendant's fraud. And so he doesn't have to pay any restitution award. Now, the victim would get to keep the extra amount of the money in the same way that happens in any foreclosure proceeding when there's no fraud involved. If a bank forecloses. You would agree that a different rule applies if there is some unreasonable delay in disposing of the property? Yes. And in our view, that's a proximate cause question, because then the victim's net losses wouldn't be caused by the defendant's fraud. And what do you do in the case of some dramatic development between the return of the house as opposed to the property and its sale? It depends what sort of dramatic development you mean. Well, you know, something is discovered with respect to the property that nobody knew about. It's suddenly it's a hazardous chemical zone and the property is worthless, while when it was returned, not returned, I don't mean the prejudged case. When the bank got it, it was worth $200,000, but all of a sudden it's, you know, Love Canal or something and it's worth nothing. Well, so in our view, you know, the house is only worth what someone is willing to pay for in an arms-length transaction. And so if there's something about the house that you just didn't know when the bank got the house, then that really wouldn't be the value of the house. The value of the house is what you can sell it for. And if there's something that's not worth it. No, no, but my point is, is it the value you could sell it for before this discovery of an extraordinary condition or is it the value afterward? I think in that case it would probably be whatever the money that the bank can get for the house. But if there's some other type of event, like if, you know, if there's an earthquake in the middle of the country that destroys the house, then I think that would be sort of a classic example of something that would break the chain of proximate cause. And so what would happen in that case usually is the bank would get paid by its insurance company compensated for the loss of the house. And you would sort of value the house at the time that it was destroyed after the bank acquired it. And then the insurance company in that case wouldn't be entitled to any restitution from the defendant, because it wouldn't be the defendant's actions that caused the destruction of the house. What he's saying is that just the fact that the housing market went down is an intervening, nonforeseeable event that breaks the chain of causation. Under our view, that's absolutely not correct. The very nature of the defendant's scheme injected the health of the housing market into the ultimate determination of the victim's net losses. He — his design was that he would take money from the banks and promise to pay it back. He had no intention to pay it back. In fact, never made a single payment. That necessarily and foreseeably triggered the foreclosure, which caused the banks to own the houses and then caused them to put them on the market and sell. It's absolutely foreseeable that it takes banks a certain amount of time to sell the houses. Absolutely foreseeable that the value of the houses will fluctuate over time. You don't have — no one has to be able to predict what the houses would have been worth on a particular date in the future to be able to say that it was foreseeable that the value would change. And the MVRA allocates any risk from a change in property to a defendant, not to the victim. And that's consistent with our view. If there are no further questions, I can rest. I guess I'd just like to end by reiterating our main point, which is that the text of this case, and what it focuses on, is how much of the property that was lost has been returned to the victim before sentencing. When the property that was lost was a car, you don't get an offset for returning pineapples. When the property that was lost was money, you don't get an offset for returning the house. But in this case, as in almost all mortgage fraud cases, the banks were able to get back some of the property they lost when they sold the houses. And so there's no valuation question here. It's not a question of how much of the property that was lost did the banks get back. The district court knew 100 percent for sure, because the houses that were sold before Mr. Roberts was even charged with the crime. Roberts. Well, what if they get the house, and as soon as they get it, there are ten offers at $500,000 or more, and the amount of the restitution is, you know, $300,000 or whatever. But the bank says, you know, I think the market is going to go even higher, so I'm not going to sell it right away. I'm going to wait. Not an unreasonable length of time, but I'm going to wait. And then the market craters. I mean, is it the same rule, then, that they only get what they were able to sell it for? I mean, as long as what the banks, what the bank did was commercially reasonable. If the bank makes any, I think it would be reasonable. I mean, I know banks like to get rid of property as soon as possible, but, you know, they make decisions at some point. Let's wait before we sell this. Is that commercially reasonable? I mean, it's hard to know. You know, you wouldn't want to judge that with 100 percent perfect hindsight, right? You want to say, if you were in the bank's shoes at the time they made the decision, was that a commercially reasonable decision? And, you know, that's a decision that would have to be made in those cases. Scalia. Why should the defendant here subsidize the bank's playing the market? That's what you're saying. No, what I'm saying is that the bank's playing the market. It says, yeah, we could sell it for so much now, but, yeah, it may go up. And you're saying, you know, he's paying for the bank's roll of the dice. And so if it really, if there really is evidence that the bank is sort of really rolling the dice, then that might be a harder question. Generally, what the bank wants is to turn the house into money, because the bank is not in the business of owning houses. It's in the business of having money. And, again, the banks don't have in their mind that they're going to get a restitution payment when they take the houses. What they have in mind is that they're going to take a loss, that they've had to foreclose on the house, it's a bad mortgage. Generally, they're going to get back less for the house than what they got for the mortgage. And if that happens, they consider it a loss. And I think any business person would consider that a loss. And it's perfectly foreseeable that it's going to take the bank a certain amount of time to turn the house into cash. But when that's happened before sentencing, it's really an easy case to apply Section 3663a, because you absolutely know for sure how much of the lost property has been returned to the victim, and it's the amount of money they got for the sale. Kagan. But if I could just be clear about what you're saying, you're saying that it's not the sale price when the sale is for a nominal amount, is that right? Yes. And it's not the sale price if the lender has done something commercially unreasonable? Yes. Is that right? Yes. And so if that's right, and both of those things sound right, but why doesn't that kind of explode your statutory argument? Because then it's not any part of the property that's returned. Because the other parts of the statute require — have approximate cause requirement. And so you're only — the victim is only entitled to get restitution for the amount of its losses that are attributable to the defendant's criminal conduct. And so if part of the bank's losses, i.e., the smaller amount of the return it gets for selling the houses, is because of the bank's independent action, then that part of the loss is not attributable to the defendant. Let's — I've followed you up through here, I think. You're into B. Yes. He's pointing to little 2. Right. And you're saying that really is not relevant here because it's cash. None of the property was returned. They gave him a house, not the cash. Well, we're saying it's relevant when the bank sells the house because then part of the property is returned. Well, wait. What they have is the house. They have the house until they sell it, and then they have the cash. Oh, you're going to — I see. And so it's the cash they get when they sell the house that is the case. And that is if they've sold it before the sentencing. Right. Which happens in almost every case. Well, let's suppose it doesn't. And they still have it as of the time of sentencing. Then we're over into 3A. It's an in-kind — 3664. Right. It's an in-kind payment. The judge has discretion as to how to value it. He could say sell it within 90 days, and we'll take that. Right. Or he could say if you don't want to do that, we call in the assessors. It wouldn't be considered an offset under section 3663A.B.1.B.2. But you're saying because 3, little 2 applies, that when it's transformed into cash prior to the sentencing, then they have received some part of the money back. Yes. And often that will work in favor of the defendant. It will because — Sometimes, as in this case, it won't if the housing market collapses. Sometimes it goes down, but other times it goes up. And the trend over time is that the housing market goes up. And so more often than not, in the larger picture, it will inert the benefit of the defendant. So what's — Where do you value for the person who — the creditor, the secured creditor who acts unreasonably? Let's assume an unreasonable act, and you said it might have been commercially unreasonable to hold on to the property after somebody offered them twice the amount of their mortgage. Well, I think in those unusual circumstances, it would be as you suggested earlier, which is that you would value it as of the date it would have been reasonable to dispose of the property in a fair market, arm's-length transaction. So — And that's usually not — What do you think of this test? In calculating a creditor's loss resulting from a secure transaction, the restitution order award should be offset by the amount that a reasonably diligent creditor under the same or similar circumstances could or would — or could, would, or did obtain for the collateral. I think generally that's fine. I think in the — really in the mine run of cases, the lion's share of cases, you're going to be sort of overly complicating the district court's inquiry, because in almost all of the cases, the houses have been sold. And so you know you can look at the dollar figure that the bank's got, and that's the amount you can use. And that fits into what you described, but to sort of describe it in a more complicated way, I think in most cases — It's not just more complicated. It's a question of, I guess, who has the burden. As I understand what you're proposing is you get the sale price, but it's — it's available to the defendant to show that the sale price was unreasonably low because of gamesmanship on the part of the bank or some other reason. Right? You think that would be available to the defendant? I think that would be available to the defendant. He would prefer that to the other formulation, wouldn't you? Yes. And I think there's a presumption that banks are going to act in a commercially reasonable way because they have no expectation of getting any money back through the restitution process. If the sale — if at the time of sentencing, the house has not yet been sold, but there's no — there's good reason for the delay, because, for example, there are no bids at an earlier time. Could the judge defer the restitution order until the house is sold? So as Justice Breyer suggested, under our view, the court — the district court's first resort would be to say — to push off the determination of the restitution amount for 90 days under 3664 D-5 and give the bank a little more time to sell the house, because in that case, a determination — we wouldn't be able to ascertain the net losses of the victim. If a bank still couldn't sell the house, then I think under this Court's decision in Dolan, what the court could do is say, yes, I'm going to order a restitution. The restitution will be for the full amount of the mortgages, the money that was lost, minus whatever amount of money the banks get back when they sell the houses. And if the bank has not been able to sell the house at that point, it's really to everyone's benefit to give them the chance to do it, because if no one wants to buy the house and you force the district court to value the house at that point, it's going to give it a really low value, and that doesn't help the defendant. It doesn't really help the bank. What does the defendant do if they act unreasonably after that order? If the bank does a nominal sale and only gets $100. So then I think the district court would have retained jurisdiction to fill in an amount-related blank for the amount of money the bank got back, and there could be proceedings about what that amount should be. Thank you, counsel. Mr. Green, you have five minutes remaining.  The defendants have no compulsory process in this restitution ordering scheme. So that if there is a delay, Justice Ginsburg, in the ultimate sale of the property, or maybe it's for a nominal amount, or maybe it's for a discounted amount, the defendant has no way to try and look behind that transaction. They can't issue a subpoena. They can't ‑‑ they could call a witness, but it would only be if it was a friendly witness. And here, Benjamin Roeber sits with a $219,000 restitution order for which he is jointly and severally liable. As my colleague said, 182 years it takes to pay off. And there is no way for his attorney, us, to get behind the transactions at issue and challenge them. Why not? Why not? Why don't you just say, hey, I'll tell you what happened here. We gave them a house worth $100,000, and they sold it for $1. And they only want to subtract the dollar, the government. But I will tell you something. I would count that house as an in-kind payment. And it's in-kind payment, and they were wrong to sell it. And it was worth $100,000. That was totally crooked, their selling it. And therefore, I want you to say, fine, perfectly right, subtract $1, under 2, little 2, but subtract $99,000 more because of the in-kind payment that was made. Would you say that? No. Why? Because, Your Honor, in an obvious case like that, the defendant would have the ability to point to the facts and circumstances and say, you know, that doesn't appear to be an arm's-length transaction, Your Honor. And that would be obvious evidence. But much more sophisticated things are going on here, Justice Breyer. This is a situation where, if we take a look at the Inlet Shore Drive property, it sells for $166,000, which appears to be quite a bit lower than its value when the bank got a hold of that property, for nothing, for no reason that Mr. Roebers had control over. If that property had been burning down, Justice Alito, he would not have been able to go in and throw a bucket of water on it because that would have been trespassing. He had no dominion or control over that property. So in a situation where the only reason he would have been trespassing is because, in fact, he did not live in the house, as he promised the bank he would when the bank gave him the money. So why shouldn't he bear the responsibility for that consequence? Because of the bank's dominion and control, because of the situations we have been talking about here, where the bank holds on to the property unreasonably too long, right into the teeth of a Great Recession. There was no evidence of that in this case, that the bank held on too long. Well, it was 33 months after foreclosure. The foreclosure on Inlet Shore Drive took place in February 2006. The answer that Ms. Harrington gave was that there were no bids. I'm sorry, Your Honor? I think she said there were no bids. There were no bids at the foreclosure sale, but that frequently happens, that there's no bids at the foreclosure sale, Your Honor. We don't know, and this is another point about the defendant's discovery. We don't know what happens after the lender takes control of the property. We don't know whether it's taking unreasonable risks or not unreasonable risks. And again, the defendant doesn't have the capacity. The other point Is there any reason why the sentencing judge, where there's an allegation and maybe a suggestion that there was unreasonable delay or something unreasonable was going on, require the government to provide some substantiation for what happened? There could be, Your Honor. The judge, the defense could ask the judge, Your Honor, please, could we get some discovery here? And it would be completely up to the Court whether the Court would want to do that or not, but the point is that it's opaque to the defendant, and unless the defendant can come up with something obvious, the defendant would have absolutely no opportunity to produce evidence. The other point I want to make here is a fundamental one, and respectfully, I think we're, in talking about baseball bats and pineapples and tomatoes, we're getting lost about what's actually at issue here. This is a secure transaction. This is something that the victim lender agreed to take back in the event of a default. They took a property interest. That's a property interest. This Court said that in Pasquantino. That's a property interest that they took in that particular piece of property. Benjamin Robers did not take $330,000 and say, I'm going to go buy the best house I can with it. The lender said, Benjamin Robers, here is $330,000 in your name so that you can buy this particular piece of property subject to our interest. And so when the default took place, there needed to be a return of that property interest, and it happened. Roberts. Thank you, counsel. The case is submitted.